## BILLY EDWARD ARMSTRONG AND PHOEBE J. ARMSTRONG, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 28738–09.          Filed December 19, 2012.

P–H was divorced, and his ex-wife had custody of their son C.E. A May 2003 arbitration award, a June 2003 State court order, and a March 2007 State court order provided that P–H would be entitled to the dependency exemption for C.E. (and the March 2007 order explicitly required his ex-wife to execute in his favor a Form 8332, "Release of Claim to Exemption for Child of Divorced or Separated Parents"), on the condition that P–H pay child support for C.E. P–H paid the full amount of child support throughout 2007, but his ex-wife failed to provide the executed Form 8332. P–H remarried. Ps timely filed their joint 2007 Federal income tax return, attaching the May 2003 arbitration award. During an examination of that return, Ps also provided R with P–H's 2003 and 2007 child support orders, the latter signed by P–H's ex-wife. R disallowed Ps' claim for a dependency exemption deduction for C.E. for tax year 2007. *Held*: As a substitute for Form 8332, the State court order signed by P–H's ex-wife (C.E.'s custodial parent) does not comply with I.R.C. sec. 152(e)(2)(A), because it fails to unconditionally declare that the ex-wife "will not claim such child as a dependent" for the year at issue.

Billy Edward Armstrong and Phoebe J. Armstrong, for themselves.

*Lisa R. Woods*, for respondent.

GUSTAFSON, *Judge*: The Internal Revenue Service (IRS) determined a deficiency of $1,510 in the 2007 Federal income tax of petitioners Billy Edward Armstrong and Phoebe J. Armstrong and an accuracy-related penalty of $302 pursuant to section 6662.[1] The Armstrongs petitioned this Court, pursuant to section 6213(a), to redetermine the deficiency and the accompanying penalty. The case is now before the Court on the Commissioner's unopposed motion to submit the case without trial on the basis of the parties' stipulation of facts, pursuant to Rule 122. The issues for decision are whether the Armstrongs are entitled to a dependency exemption deduction and a child tax credit for Mr. Armstrong's son

---

[1] Unless otherwise indicated, all citations of sections refer to the Internal Revenue Code of 1986 (26 U.S.C.) in effect for the tax year at issue, and all citations of Rules refer to the Tax Court Rules of Practice and Procedure.

for the tax year 2007, and, if not, whether the Armstrongs are liable for an accuracy-related penalty on the resulting deficiency. We conclude that the Armstrongs are not entitled to the deduction and the credit, but that they are not liable for the penalty.

### FINDINGS OF FACT

Mr. Armstrong is a truck driver. He and his former wife Dawn Delaney divorced, and in 2003 the couple agreed to resolve by arbitration unspecified questions regarding the support of their two children. The children stayed in Ms. Delaney's custody, but the arbitration resulted in a May 2003 "Arbitration Award" that granted to Ms. Delaney the tax exemption for "C.W." and to Mr. Armstrong the tax exemption for "C.E."[2] Under the arbitration award, Mr. Armstrong would get the dependency exemption for C.E. outright for tax years 2003 and 2004, but he would get it for later years, including 2007, only if he stayed current with child support. The arbitration award did not include a provision requiring Ms. Delaney to provide Mr. Armstrong with a Form 8332, "Release of Claim to Exemption for Child of Divorced or Separated Parents." (As we will explain below, Form 8332 is the document by which a parent who does not have custody of a child may nonetheless become entitled to claim a dependency exemption deduction for the child.) In June 2003 the Washington State court overseeing the divorce entered an "Agreed Order of Child Support on Arbitration" that incorporated this arbitration award and likewise did not require Ms. Delaney to give Mr. Armstrong a Form 8332.

In March 2007, for reasons not in the record, the Washington State court changed the June 2003 order. The March 2007 order contained the following provision:

3.17 INCOME TAX EXEMPTIONS.

Tax exemptions for the children shall be allocated as follows:

The Mother shall have the exemption for C[.W. and] the father shall have the exemption for * * * [C.E.], *as long as the father is current* with his child support obligation for the tax year involved.

In reviewing *whether or not the father is current*, he must have made all twelve of the tax year's child support payments by December 31st of that tax year.

---

[2] Pursuant to Rule 27(a)(3) we refer to minor children by their initials.

*If payments are current*, the mother shall provide the father for each enti-
tled year with an executed IRS Form 8332 (Release of Claim to Exemption
for Child of Divorced or Separated Parents) or its equivalent not later than
January 31st of the year immediately following the year for which the tax
exemption is to be claimed. The purpose of this provision is to ensure
prompt and regular payment of the child support obligation; therefore,
*exemptions lost by failure to be current* on child support payments cannot
later be claimed or asserted by subsequent payment of back payments or
arrears, nor claimed as a set-off for unpaid support. The parents shall sign
the federal income tax dependency exemption waiver.

   [Emphasis altered.]

Ms. Delaney signed the March 2007 order.

By 2007 Mr. Armstrong had remarried. He had consist-
ently made his child support payments required under the
State court's orders. But Ms. Delaney nonetheless failed to
give him an executed Form 8332 for 2007. Lacking that form,
the Armstrongs attached a copy of the 2003 arbitration
award to their timely filed joint 2007 Federal income tax
return.

The IRS examined that 2007 return. During the course of
the audit, the Armstrongs sent to the IRS copies of the 2003
and 2007 child support orders, the latter of which had been
signed by Ms. Delaney. The Commissioner nonetheless
rejected the Armstrongs' claim for a dependency exemption
deduction and a child tax credit for C.E., because the award
and orders were "condition[al]" upon Mr. Armstrong's staying
current with his support obligations. The IRS also determined
an accuracy-related penalty. The Armstrongs timely peti-
tioned this Court, and at that time they resided in South
Dakota. The parties stipulated the facts and submitted the
case for decision without trial.

## OPINION

### I. *Dependency exemption deduction claims under section 152*

An individual is allowed a deduction for exemption for
"each individual who is a dependent (as defined in section
152) of the taxpayer for the taxable year." Sec. 151(c). Sec-
tion 152(a) defines the term "dependent" to include "a quali-
fying child". Generally, a "qualifying child" must: (i) bear a
specified relationship to the taxpayer (e.g., be a child of the
taxpayer), (ii) have the same principal place of abode as the
taxpayer for more than one-half of such taxable year, (iii)

meet certain age requirements, and (iv) not have provided over one-half of such individual's support for the taxable year at issue. Sec. 152(c)(1). Under those provisions, Mr. Armstrong could not claim C.E. as a dependent for 2007 because they did not have the same place of abode for more than one-half of the year.

However, in the case of divorced parents, special rules determine which parent may claim a dependency exemption deduction for a child. *See* sec. 152(e); *Espinoza v. Commissioner*, T.C. Memo. 2011–108; *cf.* sec. 152(c)(4). Pursuant to section 152(e), when certain criteria are met, a child like C.E. may be treated as a qualifying child of the noncustodial parent (here, Mr. Armstrong) rather than of the custodial parent (Ms. Delaney).[3] Sec. 152(e)(1); 26 C.F.R. sec. 1.152–4T(a), Q&A–2, Temporary Income Tax Regs., 49 Fed. Reg. 34459 (Aug. 31, 1984). C.E. could be the qualifying child of Mr. Armstrong, under section 152(e)(1) and (2), if—

• The "child receives over one-half of the child's support during the calendar year from the child's parents * * * who are divorced * * * under a decree of divorce", sec. 152(e)(1)(A);

• such child was "in the custody of 1 or both of the child's parents for more than one-half of the calendar year", sec. 152(e)(1)(B);

• "the custodial parent signs a written declaration (in such a manner and form as the Secretary may by regulations prescribe) that such custodial parent will not claim such child as a dependent for any taxable year beginning in such calendar year", sec. 152(e)(2)(A); and

• "the noncustodial parent attaches such written declaration to the noncustodial parent's return" for the appropriate taxable year, sec. 152(e)(2)(B).

This case turns on whether Mr. Armstrong is able to show compliance with the third of these criteria[4]—i.e., whether

---

[3] For these purposes, Ms. Delaney was C.E.'s custodial parent and Mr. Armstrong was C.E.'s noncustodial parent, because the State court orders gave Ms. Delaney sole custody of C.E. *See* sec. 152(e)(4); 26 C.F.R. sec. 1.152–4(b), Income Tax Regs.

[4] The Commissioner also argues that the Armstrongs are unable to show compliance with the fourth criterion—i.e., "attach[ing] such written declaration to the noncustodial parent's return"—since the Armstrongs attached to their tax return only the May 2003 arbitration award, and not the March 2007 court order that Ms. Delaney actually signed. Since we are able to resolve the case on the basis of the third criterion, we need not and do not reach this fourth cri-

Continued

Ms. Delaney ever signed a declaration that she "will not claim such child as a dependent".

The IRS's Form 8332 provides an effective and uniform way for a custodial parent to make the declaration required in section 152(e)(2)(A) for the benefit of the noncustodial parent. But a noncustodial parent like Mr. Armstrong may also rely on an alternative document, provided that it "conform[s] to the substance" of Form 8332.[5] *See* 26 C.F.R. sec. 1.152–4T(a), Q&A–3, Temporary Income Tax Regs., *supra*. In particular, for tax years including the year at issue here, a court order that has been signed by the custodial parent may satisfy section 152(e)(2)(A) as the noncustodial parent's declaration if the document "conform[s] to the substance" of Form 8332.[6] *See Briscoe v. Commissioner*, T.C. Memo. 2011–165 (concluding that the court order attached with the return did not conform with the substance of Form 8332); *cf. Boltinghouse v. Commissioner*, T.C. Memo. 2003–134 (holding a separation agreement conformed with the substance of Form 8332).

A basic element necessary for satisfying section 152(e)(2)(A) is a custodial parent's declaration that she "will not claim" the child as a dependent for a taxable year. A custodial parent accomplishes this on a Form 8332 with the following statement: "I agree not to claim * * * for the tax year". This statement is unconditional; and in order for a document to comply with the substance of Form 8332 and ultimately section 152(e)(2)(A), the declaration on the document must also be unconditional. *See Gessic v. Commissioner*, T.C. Memo. 2010–88; *Thomas v. Commissioner*, T.C. Memo. 2010–11; *Boltinghouse v. Commissioner*, T.C. Memo. 2003–134; *Horn v. Commissioner*, T.C. Memo. 2002–290.

---

terion.

[5] Form 8332 requires a taxpayer to furnish: the name of the child; the name and Social Security number of the noncustodial parent claiming the dependency exemption deduction; the Social Security number of the custodial parent; the signature of the custodial parent; the date of the custodial parent's signature; and the year(s) for which the claims were released.

[6] For taxable years starting after July 2, 2008, a court order signed by the custodial parent will *not* satisfy 26 C.F.R. section 1.152–4(e)(1)(ii), Income Tax Regs., as amended by T.D. 9408, 2008–2 C.B. 323, 327 ("A written declaration not on the form designated by the IRS must conform to the substance of that form and must be a document executed for the sole purpose of serving as a written declaration under this section. A court order or decree or a separation agreement may not serve as a written declaration").

II. *The insufficiency of a custodial parent's conditional release*

We assume here that Ms. Delaney's signature on the March 2007 order constitutes, in effect, her declaration that she would comply with the order. Therefore, the critical question is whether, by declaring that she would comply with the March 2007 order, Ms. Delaney thereby declared that she "will not claim" C.E. as a dependent in 2007.

That March 2007 order did not provide unconditionally that Ms. Delaney would not claim a dependency exemption deduction for C.E. or that she must sign Form 8332. Rather, the order unambiguously stated that her obligation to sign the release—and Mr. Armstrong's right to the exemption—was conditional upon Mr. Armstrong's payment of child support.[7] This child support requirement appears nowhere in section 152(e),[8] of course; but the State court order affirmed this obligation in four ways, by providing—

• that Mr. Armstrong would obtain the exemption (and that Ms. Delaney would release it) only "*as long as* the father is current with his child support obligation";

• that entitlement to the exemption would require first a determination of "*whether or not* the father is current";

• that Ms. Delaney would release her claim only "*If* payments are current"; and

• that an exemption might be "*lost* by failure to be current". (Emphasis added.)

That is, Mr. Armstrong would *not* obtain the exemption—and Ms. Delaney was *not* obligated to release it—if Mr. Armstrong was not "current with his child support obligation"; in

---

[7] Because the year at issue is 2007, this case is not governed by current 26 C.F.R. section 1.152–4(e)(1)(i), Income Tax Regs., as amended by T.D. 9408, 2008–2 C.B. at 327, effective for tax years starting after July 2, 2008. That regulation states that "The written declaration * * * must be an unconditional release of the custodial parent's claim to the child as a dependent for the year or years for which the declaration is effective. A declaration is not unconditional if the custodial parent's release of the right to claim the child as a dependent requires the satisfaction of any condition, including the noncustodial parent's meeting of an obligation such as the payment of support."

[8] The statute itself does provide a "support" criterion that must be satisfied before a noncustodial parent may claim the dependency exemption deduction: The first of the four criteria listed above is that the child must receive over one-half of his support from his "parents" (without any distinction between the custodial parent and the noncustodial parent). *See* sec. 152(e)(1)(A). The statute does not condition a noncustodial parent's entitlement to the exemption on his fulfillment of child support obligations. Rather, under the statute the noncustodial parent may obtain the dependency exemption deduction as long as the parents together support the child, the child was in the custody of one or both of them for the year, the custodial parent executes a proper declaration, and the noncustodial parent attaches that declaration to his return.

that case, the exemption was "lost" to Mr. Armstrong, notwithstanding the other terms of the order. By signing the order, Ms. Delaney effectively declared circumstances under which she would *not* release her claim but would instead report herself to be entitled to the dependency exemption for C.E.

Therefore, in signing and assenting to the order, Ms. Delaney did not declare that she "will not claim such child as a dependent". Instead, she thereby declared that she will *not* claim C.E. as a dependent *if* Mr. Armstrong keeps current with support payments; but she also thereby unambiguously declared that if he does *not* keep current, then she *will* claim the child as a dependent. This makes her declaration quite different from a declaration that she "will not claim such child as a dependent" for the year at issue. Sec. 152(e)(2)(A). And to that extent, her conditional declaration is at odds with the statute, since "only a release that is unconditional conforms to the substance of Form 8332". *Thomas v. Commissioner*, T.C. Memo. 2010–11, slip op. at 9.

Of course, Mr. Armstrong can point to the stipulated fact that, although the State court order was conditional, he fulfilled the condition: He did keep current with his support obligations, so that under the terms of the order, he was entitled to the exemption deduction and Ms. Delaney was obliged to execute the release. The question here, however, is not what he was entitled to under the State court order but what he is entitled to under section 152(e). *See Miller v. Commissioner*, 114 T.C. 184, 196 (2000) ("Although the Permanent Orders granted * * * [the noncustodial parent] the right to claim the dependency exemptions for his children, a State court cannot determine issues of Federal tax law"), *aff'd on other grounds sub nom. Lovejoy v. Commissioner*, 293 F.3d 1208 (10th Cir. 2002).

The drafters of section 152(e) removed from the equation the issue of proving support by the noncustodial parent. The statute requires a declaration that the custodial parent "*will not* claim" the child, sec. 152(e)(2)(A) (emphasis added); and where (as here) the noncustodial parent uses a substitute for Form 8332 from which the statutorily mandated declaration is missing, and the custodial parent declares instead that she *may or may not* claim the child, that defect is not cured by the noncustodial parent's proof that he has fulfilled support

conditions beyond those in the statute, *see Brissett v. Commissioner*, T.C. Memo. 2003–310 (compliance with terms of separation agreement not sufficient to authorize dependency exemption deduction without attaching valid Form 8332 or equivalent).

The record in this case illustrates the commonplace that custody and support orders are amended from time to time, and we have observed that "the Internal Revenue Service cannot be expected to police divorce decrees and separation agreements or determine taxpayer compliance therewith." *See Gessic v. Commissioner*, T.C. Memo. 2010–88, slip op. at 8. Moreover, support obligations will sometimes consist of more than stated amounts of monthly payments; a support obligation may, for example, include health insurance coverage, the varying cost of which will in turn affect the amount of the cash payment otherwise due from the noncustodial parent. The question whether the noncustodial parent has fulfilled his obligations, though apparently easy in this instance, may be difficult and controversial in others. If that question had to be answered before one could determine the proper claimant of the dependency exemption deduction, then section 152(e) would fail of its purpose. As we explained in *Miller v. Commissioner*, 114 T.C. at 195–196, Congress added the written declaration requirement to section 152(e) in 1984 to provide more certainty to the "often subjective and * * * difficult problems of proof and substantiation" that accompanied dependency exemption deduction disputes under the prior statutory scheme. H.R. Rept. No. 98–432 (Part 2), at 1498 (1984), 1984 U.S.C.C.A.N. 697, 1140.[9] Any rule by which Mr. Armstrong could prevail here would require us to revert to resolving those "difficult problems of proof and substantiation" that we were supposed to leave behind with the prior scheme. We therefore hold that under section 152, C.E. is not a qualifying child of Mr. Armstrong for tax year 2007; and as a result, Mr. Armstrong is

---

[9] The House report stated:

The present rules governing the allocations of the dependency exemption are often subjective and present difficult problems of proof and substantiation. * * * The committee wishes to provide more certainty by allowing the custodial spouse the exemption unless that spouse waives his or her right to claim the exemption. Thus, dependency disputes between parents will be resolved without the involvement of the Internal Revenue Service. [H.R. Rept. No. 98–432 (Part 2), at 1498–1499 (1984), 1984 U.S.C.C.A.N. 697, 1140.]

not entitled to the dependency exemption deduction for C.E. for 2007.

Mr. Armstrong's case is quite sympathetic: He was up to date on his child support; and under the State court order, Ms. Delaney was obliged to sign Form 8332 and release the exemption deduction to him. We are obligated, however, to follow the statute as written, whether the resulting disadvantage is (as here) suffered by a noncustodial parent who bore the burden of child support but did not receive an executed Form 8332, or whether the disadvantage is suffered by a custodial parent who executed a Form 8332 but then bore an undue and unintended burden of child support.

## III. *Child tax credit*

A taxpayer is entitled to a child tax credit for "each qualifying child", as defined in section 152, who has not reached the age of 17. Sec. 24(a), (c)(1). Given our determination that, under section 152, C.E. is not a "qualifying child" of Mr. Armstrong for the year at issue, it follows that Mr. Armstrong is not entitled to a child tax credit for C.E. for that year.

## IV. *Accuracy-related penalty*

### A. *General principles*

Section 6662(a) and (b)(1) and (2) imposes an "accuracy-related penalty" of 20% of the portion of the underpayment of tax that is attributable to the taxpayer's negligence or disregard of rules or regulations or that is attributable to any substantial understatement of income tax. By definition, an understatement of income tax for an individual is substantial if it exceeds the greater of $5,000 or 10% of the tax required to be shown on the return. Sec. 6662(d)(1)(A). Since the deficiency here is only $1,510, there was no "substantial understatement", and the Armstrongs are liable for the penalty only if claiming the dependency exemption deduction for C.E. amounted to negligence.

Under section 7491(c), the Commissioner bears the burden of production and must produce sufficient evidence that the imposition of the penalty is appropriate in a given case. Once the Commissioner meets this burden, the taxpayer must come forward with persuasive evidence that the Commis-

sioner's determination is incorrect. Rule 142(a); *Higbee v. Commissioner*, 116 T.C. 438, 446–447 (2001).

For purposes of section 6662, the term "negligence" includes a failure to exercise ordinary and reasonable care in the preparation of a tax return. 26 C.F.R. sec. 1.6662–3(b)(1), Income Tax Regs. Negligence is defined as a lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances. *Neely v. Commissioner*, 85 T.C. 934 (1985). The term "disregard" includes any careless, reckless, or intentional disregard of the rules or regulations. Sec. 6662(c).

A taxpayer who is otherwise liable for the accuracy-related penalty may avoid the liability if he successfully invokes one of two defenses pertinent here: [10] First, section 6662(d)(2)(B) provides that an understatement attributable to an item may be reduced where the relevant facts affecting the item's treatment were adequately disclosed on his tax return and the taxpayer had a reasonable basis for his treatment of that item. Second, section 6664(c)(1) provides that, if the taxpayer shows, first, that there was reasonable cause for a portion of an underpayment and, second, that he acted in good faith with respect to such portion, then no accuracy-related penalty shall be imposed with respect to that portion.

B. *Application to this case*

Having kept up to date on his child support, Mr. Armstrong knew that, under the State court order, he was entitled to receive Ms. Delaney's release of the exemption for C.E. and to claim the dependency exemption deduction for himself. And he was indeed so entitled, under that order. He had in his possession a copy of one version of the court order to that effect that bore Ms. Delaney's signature. Court orders can sometimes suffice as an equivalent to Form 8332; and since he lacked the Form 8332 to which he was entitled, Mr. Armstrong attached, to his tax return, a copy of a prior iteration of that order—i.e., the arbitration award. The arbitration award, like the later court order, explicitly disclosed the conditionality of Ms. Delaney's obligation to give

---

[10] Another potential defense does not appear to be implicated here: Section 6662(d)(2)(B) provides that an understatement may be reduced where the taxpayer had substantial authority for his treatment of any item giving rise to the understatement. There is no authority that can be cited in support of the Armstrongs' claim founded on Ms. Delaney's conditional release.

him the release (and the absence of her signature on that version of the document was evident).

On these facts, we do not think that the Commissioner has borne his burden to show negligence. We do not believe that Mr. Armstrong, a truck driver, was sufficiently experienced in tax accounting and law such that he would realize that entitlement under the State court order to Ms. Delaney's release did not necessarily mean entitlement under section 152(e) to the dependency exemption deduction, a distinction that might not occur to many taxpayers.

Moreover, if the Armstrongs' reporting position had amounted to negligence, we think either or both of the defenses described above would excuse them from penalty, on the facts of this case: First, regarding section 6662(d)(2)(B), the facts underlying the Government's position were certainly disclosed on the tax return by the attachment of the arbitration award. And although Ms. Delaney's release did not satisfy section 152(e), it was not unreasonable for Mr. Armstrong to believe that it did.

Second, regarding section 6664(c)(1), whether the taxpayer acted with reasonable cause and in good faith depends on the pertinent facts and circumstances, including his efforts to assess his proper tax liability and his knowledge and experience. 26 C.F.R. sec. 1.6664–4(b)(1), Income Tax Regs. The State court order and his compliance with it constituted reasonable cause to someone in his circumstance, and nothing in the record of this case suggests anything other than that he acted in good faith.

Therefore, although we hold in favor of the Commissioner with regard to the tax deficiency, we hold in favor of the Armstrongs with regard to the penalty.

> *Decision will be entered for respondent with regard to the deficiency and for petitioners with regard to the accuracy-related penalty.*

Reviewed by the Court.

THORNTON, COLVIN, FOLEY, GALE, MARVEL, GOEKE, WHERRY, KROUPA, PARIS, MORRISON, and KERRIGAN, *JJ*., agree with this opinion of the Court.

GOEKE, *J.*, concurring: The opinion of the Court narrowly focuses on the conditionality of the March 2007 order in determining that the document was insufficient to satisfy the section 152(e)(2) custodial parent release exception. The opinion of the Court's analysis is cogent and accurate; however, a noncustodial parent may validly claim a section 152 dependency exemption only if he or she "*attaches* such written declaration to the noncustodial parent's return for the taxable year beginning during such calendar year." Sec. 152(e)(2)(B) (emphasis added). Petitioners surrendered the March 2007 order during audit of their 2007 tax return. Clearly then, petitioners did not "attach" the relevant document to their return.

Although the opinion of the Court considers the March 2007 order, it acknowledges that—

The Commissioner also argues that the Armstrongs are unable to show compliance with the fourth criterion—i.e., "attach[ing] such written declaration to the noncustodial parent's return" [section 152(e)(2)(B)]—since the Armstrongs attached to their tax return only the May 2003 arbitration award, and not the March 2007 court order that Ms. Delaney actually signed. Since we are able to resolve the case on the basis of the third criterion [i.e., conditionality], we need not and do not reach this fourth criterion. [*See* op. Ct. note 4.]

The dissent, however, addresses this issue that the opinion of the Court explicitly avoids. The dissent offers that the term "attach", as used in the statutory scheme, is properly defined as "associated with" or "connected to by attribution"; accordingly, the dissent effectively submits that all relevant documents are "attached" to a taxpayer's return, irrespective of any temporal considerations relating to the point at which those documents were tendered to the Commissioner. Any such interpretation is contrived and devoid of context.

The dissent's proffered secondary definitions of "attach" are not, as suggested, all "plain meanings [that] vary so widely", *see* dissenting op. p. 498, but rather are figurative extensions of its plain, literal meaning, "to fasten", *see id.* pp. 497–498 & note 11. The plain meaning of a statute is the literal meaning of its words; and unless it is unreasonable to do so, we should prefer the plain and literal meaning of a statutory term. *See United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 242 (1989) ("The plain meaning of legislation should be conclusive, except in the 'rare cases [in which] the literal

application of a statute will produce a result demonstrably at odds with the intentions of its drafters.'" (alteration in original) (quoting *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571 (1982))). If secondary figurative definitions could claim "plain meaning" status, then Congress would have to frequently qualify its chosen language with the adverb "literally" to foreclose the dissent's interpretive method. We should reject any such artificial complication of the Code and, instead, employ a traditional, consistent and pragmatic approach to statutory interpretation.

Indeed, a cursory reading of the numerous section 152(e)(2) cases decided by this Court reveals that we have uniformly held that the Form 8332 or similar document should be affixed to the return at issue. *See, e.g.*, *Chamberlain v. Commissioner*, T.C. Memo. 2007–178, 2007 Tax Ct. Memo LEXIS 181, at *8–*9; *Brissett v. Commissioner*, T.C. Memo. 2003–310, 2003 Tax Ct. Memo LEXIS 311, at *8–*9. In the seminal dependency exemption case of this Court, *Miller v. Commissioner*, 114 T.C. 184, 191 (2000), *aff'd sub nom. Lovejoy v. Commissioner*, 293 F.3d 1208 (10th Cir. 2002), we prefaced our discussion of whether a divorce document qualified as "a statement conforming to the substance of Form 8332" by specifically finding that the taxpayer "attached" the document to his return. However, if we were to accept the position of the dissent in the present case, this prelude would be irrelevant, as apparently all documents which are submitted to the Commissioner at some indeterminate point may be appropriately considered by the Court.

Furthermore, while the dissent endeavors to manipulate the seemingly plain meaning of the term "attach" to accommodate the expanding electronic tax return filing regime, we are presented with no reason to do so in this case. Petitioner physically filed his individual tax return for taxable year 2007, and our focus should appropriately narrow to those particular facts. Instead, by approaching this present matter in a side opinion, we risk complicating our tax laws by implication. Indeed, the dissent's mere suggestion that the term "attach" is subject to different interpretations may have unintended and far-reaching consequence. *See* dissenting op. note 13 (finding 15 current Code references to "attach" or "attachment"). The onus of harmonizing the statutory scheme

with nonstatutory changes in effective administrative procedure falls upon Congress and not this Court.

We must be both circumspect and judicious in avoiding a manufactured ambiguity in our tax laws. The deliberate use of the word "attached", in the context of section 152(e)(2)(A), was intended to prescribe a contemporaneous affixation requirement; we have so held before.

THORNTON, GALE, MARVEL, WHERRY, KROUPA, GUSTAFSON, and MORRISON, *JJ*., agree with this concurring opinion.

———————————

HOLMES, *J*., dissenting: Mr. Armstrong promised to pay child support to his ex-wife, Ms. Delaney. Ms. Delaney agreed to let him claim the dependency exemption for one of their two children if he did. Mr. Armstrong paid the child support on time and in full throughout 2007. Ms. Delaney refused to sign the required IRS form that would have proved his claim. The Commissioner then rejected his claim, even though Mr. Armstrong had attached a copy of the arbitration award spelling out the deal to his 2007 return. Mr. Armstrong later produced undisputed evidence—a state-court order—that Ms. Delaney had signed off on the agreement to give him the right to claim the exemption, and that he had kept his promise to pay support.

That state-court order specified that as long as Mr. Armstrong kept current with child support, he "shall have" the tax exemption for his minor child, C.E. It also mandated that Ms. Delaney "shall provide" Mr. Armstrong "an executed IRS Form 8332" for every year he was entitled to the exemption. Even though Mr. Armstrong kept his promise and paid his child support, Ms. Delaney did not keep her part of the deal and never gave him an executed Form 8332. The first question here is whether that state-court order that Ms. Delaney did sign "conform[s] to the substance" of Form 8332. *See* sec. 1.152–4T(a), Q&A–3, Temporary Income Tax Regs., 49 Fed. Reg. 34459 (Aug. 31, 1984). The opinion of the Court agrees with the Commissioner that it doesn't. I don't take the same view.

I. *Conditionality*

Divorce decrees and separation agreements often transfer the right to a dependency exemption from one parent to another. They also very often make that transfer conditional—usually, as in this case, on the timely payment of child support. Yet the question of whether such conditional language makes it impossible to use that decree or agreement as a custodial parent's "written declaration * * * that such custodial parent will not claim such child as a dependent," sec. 152(e)(2)(A), is not one that has been analyzed by any circuit court or even, before today, answered by our Court in a precedential Opinion. (It is one that a number of our memorandum opinions have touched on.)

The majority says it is "obligated * * * to follow the statute as written," *see* op. Ct. p. 476, and concludes that allowing Mr. Armstrong to take the dependency exemption based on a state-court order containing even an unambiguous condition is "at odds with the statute," *id.* p. 474.

I agree that we must follow the statute as written, but what does the statute mean?

The question presented is: Does language in a state-court decree that "noncustodial X shall have the exemption for C.E. as long as he is current with his child support obligation for the tax year involved" "conform to the substance" of Form 8332's and section 152(e)'s requirement for a written declaration from custodial Y that she "will not claim such child as a dependent for any taxable year beginning in such calendar year?" Translated into English, the question is whether Ms. Delaney's signed promise that Mr. Armstrong shall have the exemption for C.E. if he's current with his child support is a promise not to claim the exemption herself.

Now, obviously it is—but it's a conditional promise. The rest of the Court reasons thusly:

• section 152(e)(2)(A) requires "a custodial parent's declaration that she 'will not claim' the child as a dependent." *See* op. Ct. p. 472 (citing sec. 152(e)(2)(A));

• "This statement is unconditional." *See id.*;

• "[I]n order for a document to comply with the substance of Form 8332 and ultimately section 152(e)(2)(A), the declaration on the document must also be unconditional." *See id.*;

• the language in Mr. Armstrong's form is conditional, *see id.* p. 473, and therefore,

• Mr. Armstrong's form does not conform to the substance of Form 8332 and section 152(e). *See id.* p. 474.

What has just happened is an assumption of the conclusion—the conclusion to be proved is assumed to be the case in the third bullet point (and on page 472 of the Court's opinion).

This is not a promising way to construe the language of the Code and regulations. I would look at the problem altogether differently—this question being one where "a page of history is worth a volume of logic." *See New York Trust Co. v. Eisner*, 256 U.S. 345, 349 (1921). But to gain a better understanding of the law in effect for the year at issue, I would begin in the present. As the majority notes, the Commissioner would almost certainly win on the conditionality question here if current section 1.152–4(e)(1), Income Tax Regs., as amended by T.D. 9408, 2008–2 C.B. 323, 327, applied. That regulation states:

(i) In general.—The written declaration * * * must be an unconditional release of the custodial parent's claim to the child as a dependent for the year or years for which the declaration is effective. A declaration is not unconditional if the custodial parent's release of the right to claim the child as a dependent requires the satisfaction of any condition, including the noncustodial parent's meeting of an obligation such as the payment of support. * * *

(ii) Form designated by IRS.—A written declaration may be made on Form 8332 * * * A written declaration not on the form designated by the IRS must conform to the substance of that form and must be a document executed for the sole purpose of serving as a written declaration under this section. A court order or decree or a separation agreement may not serve as a written declaration.

[*Id.*]

*See also* sec. 1.152–4(g), *Examples* (*16*), (*18*), Income Tax Regs. (as amended by T.D. 9408, 2008–2 C.B. at 329). [1]

---

[1] Whether this regulation would survive review is a question for a later day. Although the Secretary may well have legitimate reasons for limiting the scope of what can serve as a written declaration, he must do so in a rational way. *See Judulang v. Holder*, 565 U.S. ___, ___, 132 S. Ct. 476, 485 (2011). Allowing a custodial spouse to unilaterally revoke a noncustodial spouse's legal right to claim a dependency exemption—by refusing to sign a Form 8332—raises a serious question about the regulation's validity under an arbitrary-and-capricious standard. That the regulation saves time and money won't necessarily salvage an arbitrary agency policy. *See id.* at ___, 132 S. Ct. at 489–90.

As the majority acknowledges, however, *see* op. Ct. note 6 and note 7, this regulation does not apply for the 2007 tax year. *See* sec. 1.152–4(h), Income Tax Regs. (as amended by T.D. 9408, 2008–2 C.B. at 329). That means that we have to figure out what the law was before the regulation.

Apart from our caselaw, the first hint that conditions would make a taxpayer's right to claim a dependency exemption ineffective came from a January 2006 revision to Form 8332. In the "[g]eneral [i]nstructions" for a "[p]ost-1984 decree or agreement" the Commissioner noted:

If the divorce decree or separation agreement went into effect after 1984, the noncustodial parent can attach certain pages from the decree or agreement instead of Form 8332. To be able to do this, the decree or agreement must state * * * the following.

1. The noncustodial parent can claim the child as a dependent without regard to any condition (such as payment of support).
   [Form 8332 (as revised January 2006).]

But neither IRS forms nor their instructions are binding authority. *See, e.g.*, *Weiss v. Commissioner*, 129 T.C. 175, 177 (2007). The use of such a form to create substantive tax law also creates serious administrative-law problems. *See* Administrative Procedure Act, 5 U.S.C. sec. 553 (2006).

In any event, not long after this revision, the Secretary issued a notice of proposed rulemaking to change section 1.152–4, Income Tax Regs., and incorporate provisions of section 1.152–4T, Temporary Income Tax Regs., *supra*. *See* Notice of Proposed Rulemaking, 72 Fed. Reg. 24192 (May 2, 2007). The notice stated that changes to the regulation would in part be made to "provide guidance on issues that have arisen in the administration of section 152(e)." *Id.*, 72 Fed. Reg. at 24193. One of these proposed changes

further provide[d] that a written declaration must include an unconditional statement that the custodial parent will not claim the child as a dependent for the specified year or years. A statement is unconditional if it does not expressly condition the custodial parent's waiver of the right to claim the child as a dependent on the noncustodial parent's meeting of an obligation such as the payment of support. * * * [*Id.*]

The Secretary received a comment arguing that a divorce settlement agreed to by both parents should still be able to serve as a standalone declaration. *See* T.D. 9408, 2008–33 I.R.B. 323. He responded that requiring a Form 8332 or a

document specifically executed for that purpose improves tax administration and reduces controversy. *See id.* at 325. To be sure, these are laudable goals. But this sort of rule-crafting is his domain, not ours. *Cf. Judulang v. Holder*, 565 U.S. ___, ___, 132 S. Ct. 476, 489–90 (2011) (rejecting government assertion that regulation "saves time and money" in invalidating an "arbitrary agency policy"). What's telling about his actions, and relevant to the analysis of the state of the law before section 1.152–4, Income Tax Regs., as amended by T.D. 9408, 2008–33 I.R.B. 323, is that the Secretary believed he needed to redraft his regulation to ban conditionality.

But was he correct?

A. *Congress's and the Commissioner's Views of Conditions*

I would begin by noting that *all* noncustodial parents' claims to exemptions for their children used to be conditional—conditional on the parent's providing more than half the support for the child during the tax year. *See* sec. 152 (as in effect before the Act of Aug. 31, 1967, Pub. L. No. 90–78, sec. 2, 81 Stat. at 192). This set up enormously involved battles between former spouses about who spent how much and for what and on whom, and Congress finally came to our Court's relief after noticing that nearly five percent of all income-tax cases were of this type. *See* H.R. Rept. No. 90–102 (1967), 1967–2 C.B. 590, 592.

Congress's first attempt at a solution was to add section 152(e) to allow parents to allocate exemptions in a divorce decree or separation agreement. *See* Act of Aug. 31, 1967, sec. 1, 81 Stat. at 191–92. It gave a noncustodial parent the dependency exemption if the divorce decree or separation agreement awarded him the exemption and he provided the child at least $600 of support in any given tax year. The "overriding purpose" of the change was "to provide certainty to the parties." *McClendon v. Commissioner*, 74 T.C. 1, 3 (1980) (citing S. Rept. No. 90–488 (1967), 1967 U.S.C.C.A.N. 1527, and H.R. Rept. No. 90–102, *supra*); *see also* S. Rept. No. 90–488, *supra*, 1967 U.S.C.C.A.N. at 1529 ("[T]he bill * * * amend[s] present law to provide a set of rules under which [the dependency exemption] issue may be resolved on a basis that is more satisfactory to the parents and which

will alleviate the current administrative burden"). Yet Congress still made the IRS's respect for that allocation conditional on the noncustodial parent's providing at least $600 in child support—a condition that would allow the kind of agreement Mr. Armstrong had with Ms. Delaney. *See* Act of Aug. 31, 1967, sec. 1, 81 Stat. at 191–92. The legislative history of section 152(e) says that this would allow state courts "hearing divorce and separation suits to resolve [the dependency exemption] issue in many cases at the time they are considering the financial arrangements which are to apply between the parents and to take the income tax deduction directly into account in this connection." S. Rept. No. 90–488, *supra* at 1529. Congress also provided a second method for a noncustodial parent to get the exemption: He could show that he spent at least $1,200 on the child, but only if the custodial parent could not "clearly establish" that she spent more on that child. *See id.* at 1528.

Our caselaw interpreting that version of section 152(e) confirmed that conditionality in a separation agreement or a divorce decree did not prevent a noncustodial parent from claiming the dependency exemption. *See Flatt v. Commissioner*, T.C. Memo. 1986–495, 1986 WL 21704 ("[W]here a divorce agreement *conditions* the claim for dependency exemptions upon the performance of specific obligations, it is appropriate for this Court to determine if, in fact, the party obligated to meet such conditions has fully complied"); *Flautt v. Commissioner*, T.C. Memo. 1983–172, 1983 WL 14153 (analyzing whether noncustodial parent had fulfilled the conditions of a separation agreement in deciding whether he qualified for dependency exemption under section 152(e)(2)).

The second method by which the noncustodial parent could claim the exemption, however, proved exceptionally contentious. *See, e.g.*, Justin S. Holden, "The Domestic Relations Tax Act of 1984", 34 R.I. B.J. 11, 11 (1986) ("Under prior law the Tax Court was the scene of literally thousands of trials to determine whether Mom or Pop was entitled to the $1,000 exemption for little Johnny"). This spurred Congress to substantially revise section 152(e) in the Deficit Reduction Act of 1984 (DEFRA), Pub. L. No. 98–369, sec. 423(a), 98 Stat. at 799. During that overhaul, Congress collapsed the two exceptions into one:

SEC. 152. DEPENDENT DEFINED.

(e) SUPPORT TEST IN CASE OF CHILD OF DIVORCED PARENTS, ETC.—

\* \* \* \* \* \* \*

(2) EXCEPTION WHERE CUSTODIAL PARENT RELEASES CLAIM TO EXEMPTION FOR THE YEAR.—A child of parents described in paragraph (1) shall be treated as having received over half of his support during a calendar year from the noncustodial parent if—

(A) the custodial parent signs a written declaration (in such manner and form as the Secretary may by regulations prescribe) that such custodial parent will not claim such child as a dependent for any taxable year beginning in such calendar year, and

(B) the noncustodial parent attaches such written declaration to the noncustodial parent's return for the taxable year beginning during such calendar year.

[Sec. 152(e)(2) (as amended by DEFRA sec. 423(a)).]

Congress eliminated the troublesome $1,200-but-more-than-your-ex spending test, but grandfathered for divorce decrees already in effect the old allocation-in-the-decree-plus-prove-more-than-$600-in-child-support test. *See* sec. 152(e) (as amended by DEFRA sec. 423(a)).

As the majority notes, *see* op. Ct. note 9, Congress's purpose in making these changes was "to provide more certainty by allowing the custodial spouse the exemption unless that spouse waives his or her right to claim the exemption." H.R. Rept. No. 98–432 (Part 2), at 1499 (1984), 1984 U.S.C.C.A.N. 697, 1140. Congress wanted more certainty because aspects of the law then in place were "often subjective and present[ed] difficult problems of proof and substantiation." *Id.* at 1498, 1984 U.S.C.C.A.N. at 1140. The majority takes this language and says it was aimed at banking the fires from parents fighting over the first method (the allocation-in-the-decree-plus-prove-more-than-$600 test) that we were having to extinguish. *See* op. Ct. p. 475 & note 9. But look at the very next sentence from the House report: Congress emphasized instead that "[t]he Internal Revenue Service becomes involved in many disputes between parents who both claim the dependency exemption *based on providing support over the applicable thresholds.*" H.R. Rept. No. 98–432 (Part 2), *supra* at 1498, 1984 U.S.C.C.A.N. at 1140 (emphasis added). This language means Congress was pointing its fire extinguisher at disputes under the second method, not the first. In other words, Congress's concern

leading up to the 1984 section 152(e) amendments was with the yearly contests between parents on how much they spent on their kids, not on conditional transfers of exemptions. Indeed, our caselaw has said as much. *See Caputi v. Commissioner*, T.C. Memo. 2004–283, 2004 WL 2955865, at *1 (noting—without mentioning the first test—that the $1,200-plus-who-spent-more-on-the-child test "put the Internal Revenue Service (IRS) in the middle of conflicts between parents that were 'often subjective and [presented] difficult problems of proof and substantiation'" (quoting H.R. Rept. No. 98–432 (Part 2), *supra* at 1498, 1984 U.S.C.C.A.N. at 1140)).

Congress expected that the requirement of getting a declaration would increase the probability that noncustodial parents would keep current in their payment of child support: "the declaration may be made by the custodial spouse annually in order to better insure the receipt of child support payments." *See* H.R. Rept. No. 98–432 (Part 2), *supra* at 1499, 1984 U.S.C.C.A.N. at 1141; *see also* Rodney V. Nutt, Note, "Tax Law—The 1984 Amendment to I.R.C. § 152(e): Did Congress Intend to Preempt a State Court's Authority to Allocate the Dependent Child Exemption?", 14 W. New Eng. L. Rev. 59, 68–69 (1992) (noting state supreme court's analysis that section 152(e)'s legislative history seemed to show congressional desire "to enable a custodial parent to use the dependent child exemption as an inducement" for paying child support); Roland L. Hjorth, "Divorce, Taxes, and the 1984 Tax Reform Act: An Inadequate Response to an Old Problem", 61 Wash. L. Rev. 151, 186 (1986) (suggesting the yearly approach as an enforcement mechanism for the custodial parent); James A. Rodenberg, "Allocating Federal Income Tax Dependency Exemptions in Divorce Decrees", 55 Mo. L. Rev. 1075, 1098 (1990) (suggesting same). Conditional language in a divorce decree—an agreement that the noncustodial parent can claim dependency exemptions if he pays the required child support—accomplishes the same end. The annual declaration would seem to be little more than a receipt for the fulfillment of that legally binding original promise. [2]

---

[2] Congress had, a few years before, enacted section 6402(c), *see* Omnibus Budget Reconciliation Act of 1981, Pub. L. No. 97–35, sec. 2331(c)(2), 95 Stat. at 860–61, which requires the Secretary to reduce the amount of a taxpayer's refund by the amount of his delinquent support obligations

There is nothing in this history that suggests Congress thought it needed to end conditional transfers of exemptions, or render them unenforceable at the whim of the custodial parent. It just wanted to end the yearly contests between parents on how much they spent on their kids—contests that had become the festivals of litigation.

A look at the Internal Revenue Manual (IRM) from around that time also shows the Commissioner to be unconcerned with the conditionality of transferring exemptions.[3] Shortly after Congress enacted section 6402(c), the IRS developed a "Child Support Refund Offset Program." IRM pt. 4(13)(25)0 (Dec. 23, 1986). As part of its procedures for administering section 6402(c), the IRS notified a taxpayer who was delinquent on his child-support obligations, but had nevertheless claimed the dependency exemption, that he "may not have furnished the necessary 50% support that would enable [him] to claim the dependent(s) shown on [his] return." *Id.* pt. 4(13)(25)4(1) (Nov. 16, 1992). With its notice, the IRS enclosed a questionnaire that solicited information which might substantiate the taxpayer's case. *See id.* If he provided this "substantiation", the IRS had to allow the exemption. *Id.* pt. 4(13)(25)4(2) (Nov. 16, 1992).[4]

## B. *State Courts' Use of Conditions*

Congress's and the Commissioner's lack of concern over conditions (such as payment of support) isn't surprising. Then, as now, several states allowed—or even required—courts to condition the allocation of dependency exemptions on the noncustodial parent's payment of child support. Since at least 1999, for example. Florida has *required* a divorce court's allocation of the dependency exemption to be conditional upon the noncustodial parent's payment of child sup-

---

and send the difference to the state seeking to collect such obligations. This provision—also aimed at getting child support paid—has remained substantively unchanged to this day. *See* sec. 6402(c).

[3] The IRM doesn't carry the force of law, *Rhone-Poulenc Surfactants & Specialties, L.P. v. Commissioner*, 114 T.C. 533, 543 n.16 (2000), but we can use the IRM as persuasive authority of the Commissioner's interpretation of the Code to guide our own evaluation, *see id.*

[4] Foreshadowing the discussion in the next section, this part of the IRM also speaks to the definition of attachment. One section mentions a taxpayer "submit[ting] [a] Form 8332" pursuant to the IRS's request for documentation; the taxpayer would need to submit a Form 8332 only if he hadn't already provided a declaration or a Form 8332 with his filed return. *See* IRM pt. 4(13)(25)4(3) (Nov. 16, 1992). The IRM required the taxpayer to substantiate his payment of child support even if he submitted a Form 8332. *See id.* Nothing in this IRM part indicates that the IRS would ignore a taxpayer's late submission of a Form 8332.

port. *See* 1999 Fla. Sess. Law Serv. ch. 99–359 (H.B. 145), sec. 1 (West) (currently codified at Fla. Stat. Ann. sec. 61.30(11)(a)(8) (West 2012)). Alaska has had a similar law in place since 1998. *See* 1998 Alaska Sess. Laws ch. 132 (H.B. 344), sec. 13 (currently codified at Alaska Stat. Ann. sec. 25.24.152(a) (West 2010)). And Colorado as well, since at least 1992. *See* 1992 Colo. Legis. Serv. H.B. 92–130, sec. 1 (West) (currently codified at Colo. Rev. Stat. Ann. sec. 14–10–115(12) (LexisNexis 2012)). These states are by no means outliers. [5] In states that have such a requirement, the majority's holding will allow a custodial spouse who refuses to sign a Form 8332 in violation of a divorce decree or separation agreement to unilaterally prevent a noncustodial spouse from otherwise lawfully claiming a dependency exemption. [6] I think it reasonable to conclude that our holding today will upset expectations settled under state law. It is as if a restaurant could defeat a taxpayer's deduction for a business dinner by not giving him a receipt, even if he showed us the bill and a credit-card statement that showed he paid it.

The rest of the Court reasons that the purpose of section 152's declaration requirement was to ease the IRS's burden of enforcement. But I would conclude that there is nothing in the history of DEFRA's language or apparent purpose to suggest Congress had concluded that conditioning an exemption transfer on payment of child support was too difficult to enforce. What we have—a widely followed approach in terms of state statutory law on the subject—suggests that the custodial-parent-declaration system was a low-cost and more certain way of *enforcing* a noncustodial parent's support obligations, not a trap for the unwary noncustodial parent

---

[5] Both Indiana and Minnesota also *require* the allocation of the dependency exemption to a noncustodial parent to be conditioned on the payment of child support. Ind. Code Ann. sec. 31–16–6–1.5(d) (LexisNexis Supp. 2012); *Biscoe v. Biscoe*, 443 N.W.2d 221, 224–25 (Minn. Ct. App. 1989). Similarly, in Louisiana, the courts cannot allocate the dependency exemption to a noncustodial parent if there are any outstanding child support payments owed to the custodial parent. La. Rev. Stat. Ann. sec. 9:315.18(B)(1)(a) (2008). Though to my knowledge no court has yet ruled on the issue, Louisiana's statute could be broadly read to require the noncustodial parent to *stay* current on his support obligation in order to keep the exemption. *See id.* Notably, I have found no state that disallows conditioning the allocation of the dependency exemption on the noncustodial parent staying current on his support obligations.

[6] Commentators have noted that just telling noncustodial parents in this situation that their remedy lies in asking a state court to order an offsetting reduction in future support if the custodial parent refuses to fill out a Form 8332 would cause collateral damage to the minor children who are supposed to benefit from that support. *See* James A. Rodenberg, "Allocating Federal Income Tax Dependency Exemptions in Divorce Decrees", 55 Mo. L. Rev. 1075, 1096–97 (1990).

like Mr. Armstrong who dutifully fulfills them. *See* Nutt, *supra*, at 68–69. *But see* Hjorth, *supra*, at 186 (acknowledging the potential for Mr. Armstrong's problem).

### C. *Post-DEFRA Caselaw Regarding Conditions*

So what happened with our caselaw after the 1984 amendments, and after *Flatt* and *Flautt* (which both signaled approval of looking at whether a noncustodial parent fulfilled the conditions in a separation agreement to decide whether he qualified for a dependency exemption)? Here, again, there's another page of history to read. It starts with the memorandum opinion, *White v. Commissioner*, T.C. Memo. 1996–438, 1996 WL 540111. In *White*, a divorce decree entitled the noncustodial parent to "claim the two * * * children of the marriage as his beneficiaries for income tax purposes," and required the custodial parent to execute whatever documents were necessary to enable the noncustodial parent to claim dependency exemptions for the children. *Id.*, 1996 WL 540111, at *1. The custodial parent then signed a letter saying that the noncustodial parent was indeed "entitled to claim the two * * * children of the marriage as his beneficiaries for income tax purposes." *Id.* We held, however, that the noncustodial parent couldn't take the dependency exemption because the letter didn't "conform to the substance" of Form 8332. *Id.* at *3. But why? We first noted that the letter failed to state the years for which the custodial parent was releasing the claims for exemption, and also failed to state the Social Security numbers for both parents—both requirements under the applicable regulation. *Id.* We then stated— "most importantly"—that the letter failed to explicitly state that the custodial parent would not claim either of the two children as her dependent. *Id.* We went on to note that— although the divorce decree said that the noncustodial parent was entitled to the dependency exemptions—"[s]tate courts, by their decisions, cannot determine issues of Federal tax law." *Id.*

It's often hard to glean exactly what elements are essential to a taxpayer's case when he loses for several different reasons. This is a part of tax law where a great many working- and middle-class parents try to represent themselves and are usually not very good at researching the development of

caselaw and distinguishing one precedent from another. This almost guarantees some problems in reaching consistent results. We have held, somewhat contrary to *White*, that the Social Security numbers of the parents—one of the blanks to fill in on a Form 8332—are not essential to its substance. *Bramante v. Commissioner*, T.C. Memo. 2002–228, 2002 WL 31039137, at \*2–\*3. (We have also held, somewhat consistently with *White*, that not listing which tax years the custodial parent is surrendering—another blank on that form—is fatal. *See Santana v. Commissioner*, T.C. Memo. 2012–49, 2012 WL 571284, at \*2; *Briscoe v. Commissioner*, T.C. Memo. 2011–165, 2011 WL 2709582, at \*3.) But the really striking aspect of *White* is its statement—"[s]tate courts, by their decisions, cannot determine issues of Federal tax law"—that implies that even a divorce decree that *unconditionally* transfers exemptions to the noncustodial parent isn't good enough. [7] *White*, 1996 WL 540111, at \*3.

Although the majority repeats this sweeping generalization, *see* op. Ct. pp. 474–475, [8] even this part of *White*'s holding seems not to have survived fully intact. In another memorandum opinion, *Boltinghouse v. Commissioner*, T.C. Memo. 2003–134, 2003 WL 21078104 at \*3–\*4, we held (without acknowledging *White*) that a state-court separation agreement *did* conform to the substance of Form 8332. Like the agreement in *White*, the agreement in *Boltinghouse* was an unconditional transfer. *Id.* at \*3. The important factor,

---

[7] This is a very broad generalization—state-court divorce decrees allocate rights between parents. The characterization of those rights for federal tax-law purposes remains a federal question, *see, e.g.*, *United States v. Nat'l Bank of Commerce*, 472 U.S. 713, 722 (1985), but many states and commentators view the allocation of tax exemptions as very much one of the items that state courts can and do regulate, *see* Robert G. Nassau, "How to Split the Tax Baby: What Would Solomon Do?", 61 Syracuse L. Rev. 83, 107–109 (2010); *see also* Rodenberg, *supra*, at 1084 ("[C]ourts routinely used their powers to allocate the exemption in divorce decrees"). And for many decades the Code expressly allowed state courts to allocate exemptions, as it still does for pre-1985 arrangements. *See* sec. 152(e)(3). A more precise formulation, therefore, is that a state-court allocation of federal-tax exemptions between divorced parents can't bind the Commissioner.

[8] The majority quotes a T.C. opinion. *See Miller v. Commissioner*, 114 T.C. 184, 196 (2000) ("[A] state court cannot determine issues of Federal tax law"), *aff'd on other grounds sub nom. Lovejoy v. Commissioner*, 293 F.3d 1208 (10th Cir. 2002). *Miller* itself relied on *White* when it made that statement, and it was not at all essential to our holding. In *Miller*, the noncustodial parent attached to his return a state-court order that unconditionally allocated to him the dependency exemptions for both of his children. That order, however, wasn't signed by the custodial parent. We held that the lack of a signature was the fatal flaw, determining that "[s]imply attaching a State court order that is not signed by the custodial parent to the return of the noncustodial parent does not satisfy the express statutory requirements of section 152(e)(2)(A)." *Id. Miller*'s statement regarding state-court determinations—besides being a broad generalization—would seem to be dictum.

*Boltinghouse* said, was that there was no ambiguity about what years were covered. *See id.* at \*3–\*4; *see also, e.g.*, *Loffer v. Commissioner*, T.C. Memo. 2002–298, 2002 WL 31719896, at \*2 (signed divorce decree might suffice, but not one that doesn't specify which children or tax years are covered). Ambiguity alone—not the use of a state-court agreement, and not the presence or absence of Social Security numbers—is enough to distinguish *Boltinghouse* from *White*.

The majority, however, uses *Boltinghouse* for an entirely different reason—citing it as support for its holding requiring a declaration to be unconditional for a noncustodial parent to claim the dependency exemption. *See* op. Ct. p. 472. I'm hesitant, however, to glean that principle from *Boltinghouse* because conditionality was not at issue there. We focused instead on whether the agreement conformed to the substance of Form 8332 even though it didn't explicitly state the years for which the dependency exemptions were to be released. [9] *Boltinghouse*'s holding didn't rely upon the unconditional nature of the transfer, and never appeared to hint that the absence of conditionality was a prerequisite for a declaration to conform to the substance of Form 8332.

Despite that context, our caselaw began to frequently cite *Boltinghouse* as a prohibition of using divorce decrees with conditional clauses as substitutes substantially in the same form as Forms 8332. In *Thomas v. Commissioner*, T.C. Memo. 2010–11, 2010 WL 174107, we said the dictum from *Boltinghouse* stood for the rule that "only a release that is unconditional conforms to the substance of Form 8332 and meets the requirements of section 152(e)(2)." *Thomas*, 2010 WL 174107, at \*3.

The next case to take its inspiration from the "unconditional" language in *Boltinghouse* was *Gessic v. Commissioner*, T.C. Memo. 2010–88, 2010 WL 1644694. Indeed, the majority cites *Gessic* to support its position that " 'the Internal Revenue Service cannot be expected to police divorce decrees and

---

[9] The Commissioner had also claimed in *Boltinghouse* that the agreement didn't conform to the substance of Form 8332 because it didn't include the Social Security numbers of the parents. 2003 WL 21078104, at \*4. We flatly rejected that assertion as "without merit." *Id.* (citing *Bramante v. Commissioner*, T.C. Memo. 2002–228, 2002 WL 31039137, which held that the omission of a custodial parent's Social Security number on a declaration didn't invalidate the release). *But see Thomas v. Commissioner*, T.C. Memo. 2010–11, 2010 WL 174107, at \*3 (holding decree didn't conform to the substance of Form 8332 because—among other reasons—it didn't contain parents' Social Security numbers).

separation agreements or determine taxpayer compliance therewith.'" *See* op. Ct. p. 475 (quoting *Gessic*, 2010 WL 1644694, at *3). I'd like to put some context around that statement.

*Gessic* is another case where there were multiple problems with the noncustodial parent's evidence, including a failure to name the children involved. *Id.* at *3. But in the course of denying the exemption to the noncustodial parent, we distinguished *Boltinghouse* as arising from an unconditional transfer. *Id.* (In *Gessic*, by contrast, the transfer of exemptions was until "such time as Ms. Gessic returned to work full time and earned over $20,000 per year." *Id.*) This was true as a factual matter, and it was important because the conditional language in the Gessics' agreement created an ambiguity as to what tax years were applicable. We could have added that "full time" and "earned over $20,000 per year" are not at all clear in their meanings, but to be sure we reasoned instead these terms might "change from year to year, such that petitioner's entitlement to the dependency exemptions for his children is potentially subject to change each year." *Id.*; *see also, e.g.*, *Horn v. Commissioner*, T.C. Memo. 2002–290, 2002 WL 31662270, at *2 (rejecting transfer of exemptions conditioned on the transfer "not interfer[ing] with [the custodial parent's] ability to receive Federal Student Aid," but also for failing to identify years involved).

What I would take away from *Gessic* and *Horn* is that ambiguous terms in a divorce decree—terms with two or more possible meanings, such as "if it won't interfere with the spouse's ability to get federal student loans" or "until the spouse is working full time"—are too indefinite a description of the years for which a custodial spouse is surrendering her children's exemptions. But *ambiguity* is not the same as *conditionality*. And Congress has expressly contemplated annual declarations to be a useful enforcement mechanism for timely payment of child support, and the states themselves have been making (and in some cases, are required to make) allocations of exemptions between divorcing spouses conditional on payment of child support.

That leaves our nonprecedential caselaw from *Thomas*. I acknowledge it uses a parenthetical to describe *Boltinghouse* as saying "only a release that is unconditional conforms to

the substance of Form 8332." *Thomas*, 2010 WL 174107, at *3. As explained earlier, however, conditionality was not at issue in *Boltinghouse*, its holding didn't rely on the unconditional nature of the transfer, and it didn't say that the presence of conditionality in a declaration is a bar preventing it from conforming to the substance of Form 8332. As the only habiliment with which *Thomas* cloaked its reasoning was its citation of that dictum, the origins of *Thomas*'s reasoning had no firm foundation in the statute, its legislative history, or a regulation in effect at that time. I would not have given it any weight.

D. *Whether the State-Court Order Conforms to the Substance of Form 8332*

It's important to remember here that the Commissioner stipulated that Mr. Armstrong met his condition—he in fact paid his child support in full and on time. When Mr. Armstrong satisfied that unambiguous condition precedent, Ms. Delaney—according to the terms of the state-court order—did not have a choice as to whether she could claim the dependency exemption. She categorically *did not* have a legal right to claim it.

The majority acknowledges that in this case it is easy to determine whether the noncustodial parent satisfied the condition. *See* op. Ct. p. 475. But it says that it is concerned with *other* cases where determining the fulfillment of the condition "may be difficult and controversial." *See id.* If a case in the future arises where an ambiguous condition again presents "difficult problems of proof and substantiation," we should speak to that issue at that time. But that's just not the case here. We shouldn't group Mr. Armstrong in with those other "difficult and controversial" cases when his case has no such problems. And we should definitely not hold that our conclusion is a plain-meaning construction. [10]

By holding that Mr. Armstrong is not entitled to the dependency exemption, the majority dishonors a state-court judgment ordering Ms. Delaney not to claim the exemption

---

[10] Let's assume for a moment that the Secretary promulgated a regulation that said—as an alternative to a Form 8332—a noncustodial parent can also satisfy section 152(e)(2) by attaching to his return (1) a divorce decree/separation agreement which allocates the exemption to him so long as he pays child support; and (2) substantiation that he did, in fact, meet his child support obligations. Under the majority's reasoning, that regulation would be invalid under step one of *Chevron*, which says the plain meaning of a statute overrides regulations to the contrary.

and to provide Mr. Armstrong an executed IRS Form 8332 for 1997. The legislative history of section 152(e) explicitly acknowledges the important role state courts play in allocating the dependency exemption via a court order, and nothing in the legislative history of the 1984 amendments suggests anything to the contrary. The Armstrongs are not deadbeats trying to game the system; they are honest taxpayers caught in the difficulties attendant to divorce—difficulties exacerbated by the lack of clear guidelines from the IRS and this Court. Because Mr. Armstrong fulfilled the state court's unambiguous condition to get the dependency exemption for C.E. for 2007, I don't think that condition should be used to block him from claiming it. I would instead honor that state-court order as conforming to the substance of Form 8332.

II. *Attachment*

Just because the Armstrongs should win on conditionality doesn't mean they necessarily can claim the dependency exemption for C.E. The Code also requires that the noncustodial parent "attach" the signed declaration to his tax return. *See* sec. 152(e)(2)(B); sec. 1.152–4T(a), Q&A–3, Temporary Income Tax Regs., *supra*. As the majority notes (although doesn't resolve because of its holding regarding conditionality), *see* op. Ct. note 4, the Commissioner argues that the Armstrongs didn't comply with the attachment requirement because they attached to their tax return only the May 2003 arbitration award, and not the March 2007 court order that Ms. Delaney actually signed.

This immediately creates a problem for the Armstrongs because only the arbitrator, and neither Ms. Delaney nor Mr. Armstrong (nor anyone like a lawyer who might have been empowered to act on their behalf) signed this 2003 award, and section 152(e)(2) requires a signed declaration. This means that the unsigned 2003 arbitration award fails to transfer the dependency exemption from Ms. Delaney to the Armstrongs. If the record stopped here, the Armstrongs would lose. *See, e.g.*, *Himes v. Commissioner*, T.C. Memo. 2010–97, 2010 WL 1780877, at *2–*3 (holding an unsigned divorce decree is insufficient to transfer dependency exemption); *Neal v. Commissioner*, T.C. Memo. 1999–97, 1999 WL

167689, at *3 (finding unsigned Form 8332 insufficient to transfer dependency exemption).

But—as has already been detailed—the record doesn't stop here. The Armstrongs provided two additional relevant documents to the Commissioner during the examination of their 2007 tax return, including the 2007 child support order that is at the core of the dispute over conditionality.

The Commissioner says that the 2007 order fails—not only on the conditionality issue—but also because the Armstrongs didn't attach it to their return. Like the conditionality argument, the Commissioner's position regarding attachment has some support in our caselaw, but not in any precedential Opinion. So as with the conditionality issue, I would take a closer look.

Section 152(e)(2)(B) specifically commands that "the noncustodial parent attach[ ] such written declaration to the noncustodial parent's return for the taxable year." This might seem to have an obvious meaning—at first glance "attach" might mean something like "staple" or "bind with a paper clip" or some other synonym connoting "physically fasten." Judge Goeke thinks so, and in his concurrence says that this means the Armstrongs "[c]learly * * * did not 'attach' the relevant document to their return." *See* concurring op. p. 479.

But that's not the only meaning of the word and, in an age where the IRS strongly encourages filers, especially middle-income filers with relatively simple returns, to file electronically, *see* Internal Revenue Restructuring and Reform Act of 1998, Pub. L. No. 105–206, sec. 2001(a), 112 Stat. at 723 (establishing a goal for electronic filing of at least 80% of Federal tax and information returns by 2007), I explore in more detail that simple word.

Like any other word in the Code, we normally would give "attach" its plain meaning. *See Armstrong v. Commissioner*, 99 T.C. 506, 507 (1992), *aff'd*, 15 F.3d 970 (10th Cir. 1994). According to Webster's Third New International Dictionary 140 (1961), however, "attach" has more than one:

• "connect: place so as to belong" (as in *through marriage, he attached himself to the Catholic faith*);

• "to fasten (itself)" (as in *though his resume omitted the details, the sordid details of his embezzlement conviction were firmly attached to his reputation*);

- "make fast or join (as by string or glue)" (as in *with the driver side door no longer attached to his car, Bill found the heating unit wholly ineffective*); or
- "to connect by attribution" (as in *please see the attached Word document*). [11]

It makes a big difference to the Armstrongs if "attach" means "physically fastened" and not simply "connected". Since the plain meanings vary so widely, and lead to such different outcomes here, I would look elsewhere for guidance. [12]

Since the meaning of the word "attach" isn't plain, I start with legislative history, which can be a good lexicographical source. *See Intermountain Ins. Serv. of Vail, LLC v. Commissioner*, 134 T.C. 211, 237–38 (2010) (Halpern and Holmes, JJ., concurring in the result), *rev'd on other grounds*, 650 F.3d 691 (D.C. Cir. 2011), *vacated and remanded*, 566 U.S. ___, 132 S. Ct. 2120 (2012).

Congress appears to have intended that "[w]here one of the parents claims the deduction with respect to a child pursuant to a written agreement between them, the Treasury Department may require that *reasonable substantiation* of the existence of the written agreement be submitted with his tax return." H.R. Rept. No. 90–102, at 1529, 1967–2 C.B. at 592 (emphasis added). It also delegated authority to the Secretary to issue regulations, *see id.*, which he did in 1971. They provide that:

[I]n the case of a written agreement * * * between the parents which allocates the deduction to the noncustodial parent, the noncustodial parent

---

[11] Webster's Third New International Dictionary is widely regarded as a "descriptive" dictionary—one that describes various word usages without prescribing any. *See* Phillip A. Rubin, "War of the Words: How Courts Can Use Dictionaries in Accordance with Textualist Principles", 60 Duke L.J. 167, 183–84 (2010). Lexicographers still debate whether the descriptive approach taken by Webster's Third is more appropriate than a "prescriptive" approach—one emphasizing the "proper" use of words—as employed by other respected dictionaries, such as The American Heritage Dictionary. *See id.* at 183–84 n.105.

For what it's worth, the two dictionaries track each other as to the meaning of "attach". The American Heritage Dictionary of the English Language 115 (5th ed. 2011), in relevant part, defines attach as: (1) "To fasten, secure, or join" (as in "attached the wires to the post"); (2) "To connect as an adjunct or associated condition or part" (as in "Many major issues are attached to this legislation"); (3) "To affix or append; add" (as in "attached several riders to the document"); (4) "To ascribe or assign" (as in "attached no significance to the threat"); (5) "To bind by emotional ties, as of affection or loyalty" (as in "I am attached to my family"); and (6) "To adhere, belong, or relate" (as in "Very little prestige attaches to this position").

[12] The Supreme Court has used dictionaries to "provide potential meanings from which the Court would select based on statutory purpose, legislative intent, common sense, or some other contextual argument." *See* Note, "Looking It Up: Dictionaries and Statutory Interpretation," 107 Harv. L. Rev. 1437, 1439 (1994).

must *attach* to his return (*or amended return*) a copy of such agreement * * * which is applicable to the calendar year in which the taxable year of the noncustodial parent begins. [Sec. 1.152–4(d)(2), Income Tax Regs. (as amended by T.D. 7099, 1971–7 C.B. 45, 47); emphasis added.]

Section 152(e)(2) and its regulations remained substantially unchanged until Congress enacted DEFRA in 1984. *See* DEFRA sec. 423, 98 Stat. at 799. As I detailed above, Congress collapsed two exceptions into one, substituting more or less the language of section 152(e) as it is today.

The Secretary followed this lead and issued a new temporary regulation that reflected the changes to section 152(e)(2):

Q–3 How may the exemption for a dependent child be claimed by a noncustodial parent?

A–3 A noncustodial parent may claim the exemption for a dependent child only if the noncustodial parent attaches to his/her income tax return for the year of the exemption a written declaration from the custodial parent stating that he/she will not claim the child as a dependent for the taxable year beginning in such calendar year. The written declaration may be made on a form to be provided by the Service for this purpose. Once the Service has released the form, any declaration made other than on the official form shall conform to the substance of such form.

[Sec. 1.152–4T(a), Q&A–3, Temporary Income Tax Regs., *supra*.]

One theme that emerges from this mixed history is that Congress and the Commissioner grew increasingly concerned about inefficiencies and uncertainties surrounding the dependency exemption, seeking to avoid expensive litigation where there was "little tax revenue at stake." H.R. Rept. No. 98–432 (Part 2), *supra* at 1498–99, 1984 U.S.C.C.A.N. at 1139–40. Adopting the narrowest meaning of "attaches"—i.e., physically fastens to—would advance efficiency because the IRS could, for example, decide to deny exemptions to every noncustodial parent who efiled and there might be nothing a court could do about it. And the fact that the term entered the Code when the World Wide Web was little more than a pixel on Timothy Berners-Lee's mental monitor might mean taxpayers are stuck with a meaning of "attaches" as "physically fastens contemporaneously with filing."

But I think that there is a better reading.

Congress itself referred to "*reasonable* substantiation," *see* H.R. Rept. No. 90–102, at 1529, 1967–2 C.B. at 592 (emphasis added), and the Commissioner's nod to "*amended*

return[s]" indicates that the possibility of noncontemporaneous "attachment" has always existed, *see* sec. 1.152–4(d)(2), Income Tax Regs. (as amended by T.D. 7099, 1971–1 C.B. at 46) (emphasis added). This is especially suggestive because amended returns are not returns that the Commissioner has to accept, and are often little more than claims for a refund. *See Koch v. Alexander*, 561 F.2d 1115, 1117 (4th Cir. 1977) (no statutory mandate for Commissioner to accept amended returns); *Goldstone v. Commissioner*, 65 T.C. 113, 115 (1975) (rejecting taxpayers' argument that they have the "right" to file an amended return); sec. 301.6402–3(a)(5), Proced. & Admin. Regs. (properly executed amended return treated as claim for refund). And later congressional comments about the problems with old section 152(e)'s income-support thresholds and dueling claims about which parent provided the greater amount of support likewise undercut any conclusion that "attaches" had only a narrow meaning in 1984. *See* H.R. Rept. No. 98–432 (Part 2), *supra* at 1498–99, 1984 U.S.C.C.A.N. at 1139–41. This should make one reluctant to read "attaches" as having a plain meaning, especially when doing so would deprive the Secretary of discretion under the first step of *Chevron* to adopt a broader reading and would put well-meaning but unsophisticated and unrepresented taxpayers at a great disadvantage.

But if the dictionary and legislative history don't compel a narrow reading, and there is no regulation defining the word, where else could one turn? The Code does not define "attach", and has few references to the term. [13] These sections unfortunately emit no more light than the legislative history. Other Code sections appear to give "attach" a variety of meanings.

Some, such as current section 36(d)(4), are quite strict. Section 36 provides first-time homebuyers a credit for part of the purchase price of their qualifying principal residence. Subsection (d)(4) specifies that "[n]o credit * * * shall be allowed to any taxpayer for any taxable year" if "the taxpayer *fails to attach* to the return of tax for such taxable year

---

[13] In the sense in which the word is used in section 152(e)(2)(B), I can find only fifteen current Code references to "attach" or "attachment": six in subtitle A, *see* secs. 36(d)(4), 152(e)(2)(B), 170(f)(11)(C) and (D), 274(h)(5), 646(c)(2)(B), 860(e)(4); one in subtitle B, *see* sec. 2001(f)(2); and eight in subtitle F, *see* secs. 6038D(a), 6103(b)(1), 6114(a)(1), 6213(g)(2)(P)(iii), 6501(c)(9), 6611(g)(2)(B)(ii), 6662(d)(2)(B)(ii)(I), 7477(a).

a properly executed copy of the settlement statement used to complete such purchase." Sec. 36(d)(4) (as amended by the Worker, Homeownership, and Business Assistance Act of 2009, Pub. L. No. 111–92, sec. 12(b), 123 Stat. at 2991) (emphasis added). Current section 6213 allows the Commissioner to summarily assess a tax deficiency arising from a taxpayer's failure to attach the settlement statement. *See* sec. 6213(b), (g)(2)(P)(iii) (as amended by the Worker, Homeownership, and Business Assistance Act of 2009 sec. 12(b)). And while Congress hasn't further clarified section 36(d)(4)'s attachment requirement, the National Taxpayer Advocate, in testimony before the Senate Finance Committee, noted that section 36(d)(4)'s requirement of upfront substantiation to get the first-time homebuyer credit is burdensome and may reduce taxpayer participation. *See* Complexity and the Tax Gap: Making Tax Compliance Easier and Collecting What's Due: Hearing Before the S. Comm. on Fin., 112th Cong. 31 (2011) (statement of Nina E. Olson, National Taxpayer Advocate).

Likewise, the December 2011 revision of the form given by the Commissioner to claim the credit, Form 5405, First-Time Homebuyer Credit and Repayment of the Credit, warns taxpayers about the credit's strict requirements: "Caution! You must attach a copy of the properly executed settlement statement (or similar documentation) used to complete the purchase (see instructions)." The accompanying instructions add that a taxpayer filing a return claiming the section 36(d)(4) credit "must file on paper and attach all required documentation."

Other sections are much looser. Section 170, for instance, allows taxpayers a deduction for their charitable contributions. Subsection (f)(11), however, generally disallows a deduction for any contribution of more that $500 unless the taxpayer substantiates the gift. *See* sec. 170(f)(11)(A). Subparagraphs (C) and (D) of section 170(f)(11) go further: They disallow the deduction unless the taxpayer "attaches" a qualified appraisal to his tax return. *See* sec. 170(f)(11)(C) and (D). But taxpayers needn't fasten this qualified appraisal to claim their deduction—so long as they provide it to the Commissioner within 90 days of his asking for it. *See* sec. 1.170A–13(c)(4)(iv)(H), Income Tax Regs. Here, "attach"

doesn't mean "fasten"—unlike what seems to be the case with current section 36(d)(4).

I think it helpful, on this subject where Congress seems to have been concerned about administrability, to also look at the IRM. Two sections of the IRM in effect when the Armstrongs filed their return and when they were audited seem particularly important to solving our problem. [14]

IRM pt. 21.6.1.4.2 (Oct. 1, 2007) explains the Commissioner's general procedures when dealing with "[r]eturns [w]ith [m]issing [i]nformation." It instructs return reviewers to "request[ ] the necessary information if * * * [s]upporting forms, schedules, or documents are missing." [15] *See id.* Another part of the IRM dealing with dependency exemptions is even more explicit:

IRM 21.6.1.5.8 (10–01–2002)
Verifying Form 8332 Procedure

* * * * * * *

3. Upon receipt of a math error notice response concerning a missing or incomplete Form 8332 (or similar statement) take the following actions:

* * * * * * *

C. Correspond with the noncustodial parent; enclose a blank Form 8332.

D. Request taxpayer to complete and return the Form 8332, signed by the custodial parent.

E. Tell taxpayer IRS will reconsider the request when the appropriate information is provided.

* * * * * * *

5. If taxpayer provides the appropriate documentation, allow the exemption * * *

The IRS has consistently followed such practices. [16] Around the time section 152 was amended, the IRM Classi-

---

[14] I am aware that the IRS Office of Chief Counsel has taken the position that section 6330(c)(1)'s requirement that an Appeals officer obtain "verification that 'the requirements of any applicable law or administrative procedure have been met'" in collection cases includes verification that the IRS followed procedures the IRM requires. Chief Counsel Advice 201212018 (Mar. 23, 2012); *see also Trout v. Commissioner*, 131 T.C. 239, 257–62 (2008) (Marvel, J., concurring).

[15] The IRM clarifies that returns with potential statute-of-limitations problems are "never returned to the taxpayer." IRM pt. 21.6.1.4.2 (Oct. 1, 2007). We don't have this problem here: The Commissioner was well within the general three-year limitations period when the Armstrongs filed their petition with this Court.

[16] The IRS seems to have followed this practice of requesting additional information regarding a taxpayer's entitlement to a dependency exemption where it hadn't already been provided. *See King v. Commissioner*, 121 T.C. 245, 246–47 (2003) (noting the IRS requested a Form 8332 for

fication Handbook[17] contained "[s]tandard [i]nformation [p]aragraphs," which solicited information from taxpayers "[t]o help [the IRS] complete the examination" of their tax returns. IRM pt. 41(12)0, Classification Handbook, ex. 900–2 (May 9, 1994). With regard to a claim for "other dependents"—dependents for whom the taxpayer lacked custody—the IRS would request a copy of "any written agreement stating which parent will have custody and/or claim the dependency exemption" or a Form 8332 "or similar statement." *See id.*

Current IRS procedure also underscores the Commissioner's interpretation of "attach". The IRM part dealing with "[l]oose [s]chedules"[18] says they are not rejected outright but are associated (or reassociated) with the return they relate to:

2. Upon receipt of a loose schedule * * * do one of the following:

\* \* \* \* \* \* \*

C. If you want the loose schedule attached to the original return and not returned to you, enter the employee number for Files * * *

\* \* \* \* \* \* \*

E. If the loose schedule relates to a prior year return or for a return that should have already posted, research for DLN. If DLN is found, enter it on the schedule and route it to Return Files function to associate with return. If DLN is NOT found, return the loose schedule to taxpayer.
  [IRM pt. 21.3.3.5.2 (Dec. 8, 2010).[19]]

In these subsections, "attached" is synonymous with "associated"—subsection (2)(C) mentions loose schedules' being sent to "Files" to be "attached" with their return, and subsection (2)(E) describes loose schedules for prior year returns' being sent to "Files" to be "associate[d]" with their return. *See id.* In an age of email and efiling, with physical documents converted into electrons and sent instantaneously across the world, the Commissioner can hardly be faulted for taking such a pragmatic view.[20]

---

tax year 1987 after the taxpayer had filed the return claiming the dependency exemption).

[17] IRS examiners assigned to classification were required to follow the IRM Classification Handbook. IRM pt. 41(12)0 (Nov. 1, 1984).

[18] Loose schedules are schedules "that have inadvertently been detached from, or cannot be *associated with*, a return * * * [or have been] received from taxpayers without sufficient information to indicate why they have been sent." IRM pt. 21.3.3.5.2 (Dec. 8, 2010) (emphasis added).

[19] DLN means "document locator number" in taxspeak. *See, e.g.*, *Kovacevich v. Commissioner*, T.C. Memo. 2009–160, 2009 WL 1916351, at *8.

[20] The Commissioner even has a form, Form 8453, U.S. Individual Income Tax Transmittal

Continued

These sections indicate that, informally at least, the Commissioner adopts a less rigid definition of "attach"—not just "fastened" but "associated with" or "connected to by attribution." I believe the part of the IRS bureaucracy that handles the processing of returns has a perfectly reasonable understanding of the word. For purposes of section 152(e)(2), this less-rigid definition of attach would not undermine the clarity of the law, and it would allow legitimate taxpayer claims to be heard and evaluated—without substantially impairing the efficiency of the Commissioner's processing and collection activities. I am mindful that we generally should construe deductions narrowly. *INDOPCO, Inc. v. Commissioner*, 503 U.S. 79, 84 (1992). But we aren't confronted here with the scope of a deduction: We address only a procedural rule for *examining* whether a taxpayer may claim the section 152(e)(2) exemption.

That again leaves our nonprecedential caselaw. We have consistently noted section 152(e)(2)'s attachment requirement. *See, e.g.*, *Himes*, 2010 WL 1780877, at *2; *Neal*, 1999 WL 167689, at *3–*4. And I agree with Judge Goeke that we have plenty of nonprecedential caselaw implicitly defining "attach" as "physically fasten to." In many cases involving section 152(e)(2), a taxpayer failed to staple a Form 8332 or declaration to his return but then provided additional support during audit or trial. We've looked at this additional documentation but concluded that, even if we considered it, it didn't comply with section 152(e)(2)'s other requirements. *See, e.g.*, *Santana*, 2012 WL 571284, at *2; *Norwood v. Commissioner*, T.C. Memo. 2003–63, 2003 WL 751016, at *3; *Horn*, 2002 WL 31662270, at *1–*2. In other cases, however, we've refused to look at the later-provided materials not fastened to the initial tax return. *See, e.g.*, *Espinoza v. Commissioner*, T.C. Memo. 2011–108, 2011 WL 1989733, at *1–*2 (taxpayer provided permanent order of child support, but we didn't analyze whether it satisfied section 152(e)(2) requirements); *Brissett v. Commissioner*, T.C. Memo. 2003–310, 2003 WL 22520105, at *1, *3 (taxpayer provided voluntary separation and property settlement agreement, but we didn't

for an IRS e-file Return, that he uses for paper tax forms like the Form 8332 that have to be "associated with" their electronically filed returns. *See* TIGTA Rept. 2006–30–160, "Requiring Personal Identification Numbers for Electronically Filed Returns Could Improve Tax Administration and Reduce Costs", Doc 2006–20471, 2006 TNT 192–22 (Sept. 2006).

analyze whether it satisfied section 152(e)(2) requirements). We didn't parse "attaches" in these cases, and it appears—as is so often true in subjects where *pro se* taxpayers predominate—that we did not have any argument from any of the parties in any of the cases about broad or narrow readings of the word. We appear to have simply assumed a narrow reading—"attaches" as "contemporaneously fastens"—and applied that reading to the facts of the case at hand.

In only a few cases did we address the attachment requirement head on. In *Chamberlain v. Commissioner*, T.C. Memo. 2007–178, 2007 WL 1953154, at *1, the taxpayer attached to his 1995 income tax return an original copy of an executed Form 8332 releasing his ex-wife's claim to the dependency deductions for all future years. A fire then destroyed all his copies of the document, and in later years he included a note with his income tax return referring to the original form. *See id.* The Commissioner didn't challenge Chamberlain's claim to a dependency exemption, despite his failure to attach a copy of the form to his tax returns for any of the years between 1996 and 2002. *See id.* Things changed in 2003: His ex-wife also claimed the exemption that year, and the Commissioner rejected Chamberlain's exemption claim to avoid getting whipsawed. *See id.* Chamberlain challenged the Commissioner's determination and produced at trial a letter from his ex-wife confirming the prior existence of the Form 8332, even though he couldn't locate a copy. *See id.*, 2007 WL 1953154, at *3. While sympathetic to his plight, we sided with the Commissioner, holding that his note and letter didn't satisfy section 152(e)(2) and the prior existence of a Form 8332 didn't matter—he needed to attach a copy of it every year to his tax return or he couldn't take the exemption. *See id.*

*Chamberlain* is distinguishable from this case. We are not dealing with the problems caused by the destruction of important records, but instead the problem of whether an existing record complies with the manner-and-form requirements of section 152(e)(2). Whereas Chamberlain produced no additional forms or declarations at or before trial, the Armstrongs gave the Commissioner the 2003 child support order and its 2007 modification. *Chamberlain* can just as

easily be seen as a failure-of-proof case as it can be read for a narrow reading of "attaches".

*Presley v. Commissioner*, T.C. Memo. 1996–553, 1996 WL 732832, also tackled the attachment issue. The taxpayer there apparently claimed the dependency exemption without providing any supporting documentation. *See id.*, 1996 WL 732832, at *2. He provided an executed Form 8332 at trial, but the Form was dated February 8, 1994—almost a year after the day he filed his income tax return. *See id.* We refused to accept the late Form 8332 because it wasn't attached to his return and was dated after he filed the relevant tax return. *See id.* I would view this rejection as akin to our reluctance to accept after-the-fact evidence purporting to substantiate various business expenses—unless a record is contemporaneous, we can't be sure it accurately reflects conditions as they existed at the time the expense was incurred. *See Barton v. Commissioner*, T.C. Memo. 2005–97, 2005 WL 1022957, at *3–*4 (expressing "skeptic[ism]" over allegedly substantiating records that were "reconstructed * * * over 2 years after the year in issue").

Mr. Armstrong didn't create a record after his case had begun. Instead, he dug out records the IRS asked for—the 2003 and 2007 child support orders—both of which were in effect when he filed his 2007 income tax return.

I would hold that "attaches" in section 152(e) means "associates with" or "connects to by attribution." I am convinced that this is the most reasonable way to read the section in light of the regulations contemporaneous with the amendment that suggest that attachment to a later filed amended return would suffice, the current administrative practice that encourages IRS agents to ask taxpayers for missing Forms 8332 when those forms are not physically fastened to the original return, and the practical impossibility of such a narrow reading in an era where the IRS is publicly and successfully encouraging taxpayers to file electronically. This construction of "attaches" goes against nothing either Congress or the Secretary has said. If either wishes to clarify through amendment to the Code or by regulation what "attaches" means, either is free to do so. Until then, I would understand the term to mean providing a Form 8332 or similar declaration to the Commissioner or this Court within

the time for submitting materials that can be "associated with" a given return in a case before us.

It is one of the great theorems of law that if all sides are rational actors with perfect knowledge and zero transaction costs, the allocation of resources—even including exemptions, child tax credits, and the like—would be the same regardless of the rules we choose. *See* Ronald H. Coase, "The Problem of Social Cost", 3 J.L. & Econ. 1 (1960). But in our fallen world, there are few stages on which rational actors are more outpeopled by the children of wrath than in domestic-relations law. The rest of the Court solves this case with a rule drawn against any taxpayer who tries to use, as the substantial equivalent of a Form 8332, a divorce decree or separation agreement in which the allocation of a dependency exemption includes a condition. This is a bright line. Bright lines are usually a good thing for tax law, which is speckled with multifactor tests for everything from the definition of an employee, *see, e.g.*, *Ewens & Miller, Inc. v. Commissioner*, 117 T.C. 263, 270 (2001) (seven factors), to whether a transaction is a sale, *see, e.g.*, *Grodt & McKay Realty, Inc. v. Commissioner*, 77 T.C. 1221, 1237–38 (1981) (eight factors), to the equity of granting innocent-spouse relief, *see, e.g.*, *Henson v. Commissioner*, T.C. Memo. 2012–288, 2012 WL 4815166, at *6–*7 (applying factors listed in Rev. Proc. 2003–61, sec. 4.03, 2003–2 C.B. at 298–299) (at least eight factors), to figuring out whether an activity is engaged in for profit, *see, e.g.*, *Foster v. Commissioner*, T.C. Memo. 2012–207, 2012 WL 3000350, at *5 (applying factors listed in sec. 1.183–2(b), Income Tax Regs.) (nine factors), and to deciding if a taxpayer committed fraud, *see, e.g.*, *Niedringhaus v. Commissioner*, 99 T.C. 202, 211 (1992) (eleven factors).

Maybe, with the bright line we draw today, more separated parents will hire escrow agents to manage the flow of Forms 8332. *See* Robert S. Taft, Tax Aspects of Divorce and Separation, sec. 5A.02[1], at 5A–14 n.14 (rev. 2005) (suggesting that custodial parent execute Forms 8332 to be held in escrow until a third party verifies timely payment of child support). Maybe state courts will grant the Mr. Armstrongs of the world a right to offset their future child-support payments with the value of the tax benefits they have unjustly been denied. *But see supra* note 5. Maybe we will see more gruesome spectacles of contempt and threats of jail like that we

describe in *George v. Commissioner*, 139 T.C. 508 (2012). Or maybe the Secretary, Congress, or our reviewing courts will decide that the more reasonable course is to read the Code to ensure that conditions on allocating the tax benefits of parenthood—conditions that Congress expected to continue when it enacted section 152(e), conditions that several states require as part of their family law, and conditions that parents assume in good faith are enforceable and effective will, if a parent like Mr. Armstrong fulfills them, be honored. I would have held that the Armstrongs attached the 2007 state-court order—a declaration that, in my view, conformed to the substance of Form 8332—to their return and would have allowed them to take the dependency exemption for C.E. in 2007.

I respectfully dissent.

HALPERN and VASQUEZ, *JJ*., agree with this dissent.